**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS SMITH** | : | **CIVIL ACTION** |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| **JOHN KERESTES, et al.** | : | **No. 08-0061** |
| Respondents. | : | |

**MEMORANDUM AND ORDER**

**SCHILLER, J.**                                                                                   **June 15, 2009**

Presently before the Court is Petitioner Curtis Smith's petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. Petitioner and Respondents have filed timely objections to

the Report and Recommendation of United States Magistrate Judge Lynne A. Sitarski. After

conducting a *de novo* review of the Report and Recommendation and upon consideration of

Petitioner's and Respondents' objections thereto, the Court will overrule the objections, approve

the Report in substantial part, and adopt the Recommendation.

**I.       FACTS AND PROCEDURAL HISTORY**

On July 30, 2001, after a jury trial before the Honorable Gary F. DiVito of the Court of

Common Pleas of Philadelphia County, Petitioner was convicted of attempted murder,

aggravated assault, simple assault, burglary, and conspiracy.[1] On October 26, 2001, Judge

---

[1] The following facts were set forth by the Pennsylvania Superior Court:

> On October 12, 2000, [] Joseph Lloyd and his friend, Jamie Queenan, went to Mr.
> Lloyd's house of Forrest Avenue in Philadelphia to watch a movie. They both
> entered the basement of Mr. Lloyd's house, where they remained. After a few
> moments there was a knock at the basement door. Mr. Lloyd asked who was at
> the door and the person replied "It's me, it's Jimmy, man, open the door." Mr.

DiVito sentenced Petitioner to ten to twenty years of imprisonment for attempted murder, three to six years of imprisonment for burglary, and six to twelve months of imprisonment for simple assault. Petitioner filed a direct appeal. On December 18, 2002, the Pennsylvania Superior Court affirmed the judgment of sentence. *Commonwealth v. Smith*, 817 A.2d 1185 (Pa. Super. 2002) (table). Petitioner did not file a petition for allowance of appeal in the Pennsylvania Supreme Court.

On June 10, 2003, Petitioner filed a *pro se* petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Con. Stat. § 9541, *et seq.* Counsel was appointed to represent

---

Lloyd looked through a crack in the door and saw a barrel of a gun. [Petitioner] and another man, later identified as Damon Fields, pushed their way into the house. One of the men fired a gunshot and [Petitioner] chased Mr. Lloyd upstairs.

Jamie Queenan attempted to leave the house but was stopped by Mr. Fields. She noted that Fields was wearing a black hooded sweatshirt, jeans, and boots. She could hear gunshots being fired upstairs while she was being held at gunpoint.

Mr. Lloyd then struggled with [Petitioner], trying to disarm him, and [Petitioner] fired another shot. [Petitioner's] weapon was eventually taken from him by Mr. Lloyd's step father. Mr. Lloyd eventually fled back downstairs, still trying to avoid [Petitioner]. [Petitioner] then fled the house through the basement.

Philadelphia Police Officer, Robert Livewell, on routine patrol in his radio patrol car, heard gunshots from an alleyway behind Lloyd's house. He exited the car and as he approached on foot, the officer saw [Petitioner] walking out of the alleyway. [Petitioner] ran and hid in the bushes. The officer noticed blood on [Petitioner's] pants as well as on the pavement (it was later determined that [Petitioner] had been shot).

Multiple officers responded to Officer Livewell's radio call for backup. [Petitioner] eventually collapsed and was brought to the hospital, and was released thereafter. Damon Fields was found dead in the alleyway, with a .38 caliber Colt revolver found under his body.

*Commonwealth v. Smith*, No. 689 EDA 2002 (Pa. Super. December 12, 2006), attached as Resp't Ex. "C."

2

Petitioner, and filed amended and supplemental amended petitions. On July 13, 2005, the PCRA court dismissed Petitioner's petition. On December 12, 2006, the Superior Court affirmed the PCRA court's dismissal of Petitioner's PCRA petition. *Commonwealth v Smith*, 918 A.2d 792 (Pa. Super. 2006) (table). Thereafter, Petitioner filed a petition for allowance of appeal in the Pennsylvania Supreme Court and this petition was denied on August 10, 2007. *Commonwealth v. Smith*, 929 A.2d 645 (Pa. 2007) (table).

On December 29, 2007,[2] Petitioner filed the instant petition for a federal writ of habeas corpus claiming: (1) trial court error for failing to instruct the jury that identification evidence presented at trial should be viewed with caution; (2) ineffective assistance of trial counsel for failing to object to the trial court's *ex parte* communication with the jury; and (3) trial court error for improperly applying Pennsylvania's deadly weapons enhancement at sentencing.

## II.____STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") grants to persons in state or federal custody the right to file a petition in a federal court seeking the issuance of a writ of habeas corpus. *See* 28 U.S.C. § 2254. AEDPA increased the deference federal courts must give to the factual findings and legal determinations of the state courts. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000) (citing *Dickerson v. Vaughn*, 90 F.3d 87, 90 (3d Cir. 1996)). Pursuant to 28 U.S.C. § 2254(d), as

---

[2] Generally, a *pro se* petitioner's habeas petition is deemed filed at the moment he delivers it to prison authorities for mailing to the district court. *Burns v. Morton*, 134 F. 3d 109, 113 (3d Cir. 1998) (citing *Houston v. Lack*, 487 U.S. 266 (1988)). Petitioner signed his habeas petition on December 29, 2007, and I will assume that he presented his petition to prison authorities on that date.

amended by AEDPA, a petition for habeas corpus may only be granted if: (1) the state court's adjudication of the claim resulted in a decision contrary to, or involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of United States;" or if (2) the adjudication resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Factual issues determined by a state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Werts*, 228 F.3d at 196.

The Supreme Court expounded upon this language in *Williams v. Taylor*, 529 U.S. 362 (2000). In *Williams*, the Court explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Hameen v. State of Delaware*, 212 F.3d 226, 235 (3d Cir. 2000) (citing *Williams*, 529 U.S. at 389-390). The Court in *Williams* further stated that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Hameen*, 212 F.3d at 235 (citing *Williams*, 529 U.S. at 388-389). "In further delineating the 'unreasonable application' component, the Supreme Court stressed that an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may

not grant relief unless that court determines that a state court's incorrect or erroneous application

of clearly established federal law was also unreasonable." *Werts*, 228 F.3d at 196 (citing

*Williams*, 529 U.S. at 389).

## III.   DISCUSSION

### 1.   Trial Court Error for Failing to Instruct the Jury that Identification Evidence Should be Viewed with Caution.

In his first claim, Petitioner alleges that the trial court erred when it failed to instruct the

jury that the identification evidence presented at trial should be viewed with caution.  Petitioner

argues that the trial court should have given a *Kloiber* instruction to the jury because the only

identification witness presented at trial "testified that she was only able to see Petitioner's face

for a total of 3 - 4 seconds."  *See* Pet. at 9.

In *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954), the Pennsylvania Supreme Court

held that a cautionary instruction as to identification evidence should be given:

> where the witness is not in a position to clearly observe the
> assailant, or he is not positive as to identity, or his positive
> statements as to identity are weakened by qualification or by failure
> to identify defendant on one or more prior occasions, the accuracy
> of the identification is so doubtful that the Court should warn the
> jury that the testimony as to identity must be received with caution.

*Kloiber*, 106 A.2d at 826-827.  However, when "the opportunity for positive identification is

good and the witness is positive in his identification and his identification is not weakened by

prior failure to identify, but remains, even after cross examination, positive and unqualified, the

testimony as to identification need not be received with caution - indeed the cases say that 'his

positive testimony as to identity may be treated as the statement of fact.'" *Id.*

5

In denying this claim on direct appeal, the state court first determined that based upon its review of the record, the trial court was not required to give a *Kloiber* charge. *Commonwealth v. Smith,* No. 167 EDA 2002, at p. 5, attached as Resp't Ex."A."  The state court reasoned that a *Kloiber* charge was not required because:

> Ms. Queenan's testimony identifying [Petitioner] as the perpetrator of the crime was unequivocal and consistent.  During a thorough cross-examination, Ms. Queenan remained firm in her ability to view the perpetrator and her identification of [Petitioner] as the perpetrator.  [Petitioner] did not present any evidence that Ms. Queenan failed to identify [Petitioner] on a prior occasion.

*Id.*  The state court also found that even though a *Kloiber* charge was not required, the trial court had, in fact, issued a *Kloiber* charge at trial.  *Id.*  On the issue of the eyewitness identification, the trial court instructed the jury:

> First, with respect to the identification of [Petitioner].  In her testimony Jamie Queenan has identified [Petitioner] as one of the two persons who entered the house and committed the crimes alleged.  The defense has challenged the accuracy of that identification.
>
> A victim or a witness can sometimes make [a] mistake in trying to identify a criminal.  If certain other factors are present, the accuracy of identification testimony may be received with caution. For example if the witness was in a bad position, if there was poor lighting or other reasons why the witness would not have a good opportunity to observe the criminal.
>
> If you believe that one or more of these factors are present, then you may consider with caution the testimony of Jamie Queenan identifying [Petitioner] as the person who or one of the persons who committed the crime.

*Id.*  (*See* N.T. 7/27/2001, at p. 82-84).  This instruction comports with Pennsylvania's Suggested

Standard Jury Instruction regarding identification testimony when accuracy is in doubt.[3]

Therefore, contrary to Petitioner's argument that a *Kloiber* instruction was not given, I find that

the trial court did indeed issue a *Kloiber* instruction.

Because the state court's finding on this issue is not contrary to United States Supreme

Court precedent, nor an unreasonable determination of the facts, this claim will be denied.  28

U.S.C. § 2254(d).

> **2.      Ineffective Assistance of Trial Counsel for Failing to Object to the Trial Court's *Ex Parte* Communication with the Jury.**

Petitioner next claims that trial counsel was ineffective for failing to object to two

---

[3]  407B (Crim) Identification Testimony - Accuracy in Doubt

> 2.  A victim or other witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that a jury must receive it with caution. Identification testimony must be received with caution [if the witness because of bad position, poor lighting, or other reasons did not have a good opportunity to observe the criminal] [if the witness in [his] [her] testimony is not positive as to identity] [if the witness's positive testimony as to identity is weakened [by qualifications, hedging, or inconsistencies in the rest of [his] [her] testimony] [by [his] [her] not identifying the defendant, or identifying someone else, as the criminal [at a lineup] [when shown photographs] [give specifics] before the trial]] [if, before the trial, the defendant's request for a [lineup] [specify request] to test the ability of the witness to make an identification was denied and the witness subsequently made a less reliable identification] [if, [give specifics]].

> [Second Alternative: When there is a jury issue as to whether caution is required]

> 3. If you believe that [this factor is] [one or more of these factors are] present, then you must consider with caution [name of witness]'s testimony identifying the defendant as the person who committed the crime. If, however, you do not believe that [this factor] [at least one of these factors] is present, then you need not receive the testimony with caution; you may treat it like any other testimony.

Pennsylvania Suggested Standard Jury Instructions (Crim) § 407B (2008).

instances of *ex parte* communication between the trial court judge and the jury while the jury was deliberating.  Specifically, Petitioner complains that the trial court judge improperly entered the jury room, without the presence of counsel, on two separate occasions to speak with the jury.

Claims of ineffective assistance of counsel generally are governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the United States Supreme Court set forth the standard for a petitioner seeking habeas relief on the grounds of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.  Because "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court must be "highly deferential" to counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689. In determining prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

"It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Williams*, 529 U.S. at 391.  Thus, Petitioner is entitled to relief if the Pennsylvania courts' rejection of his claims was either "contrary to, or involved an unreasonable application of," that established law.

The first instance of *ex parte* communication between the trial court and the jury occurred

on the first day of jury deliberations.  After deliberating for approximately 3 hours, the jury sent a

note to the trial court stating that the jurors were deadlocked at eleven votes to one, and that they

needed some direction as to how they should proceed.  (N.T. 7/27/2001 at 108-109).  The trial

court relayed this information to the prosecutor and defense counsel.  After some discussion, it

was decided that the jury would be sent home for the weekend, with deliberations continuing the

following Monday.  (N.T. 7/27/2001 at 109-110).  When the trial court judge brought the jury in

to dismiss them for the weekend, the jurors indicated that they were still deadlocked but that they

had additional questions that, if answered, may help in their deliberations.  (N.T. 7/27/2001 at

111-112).  A note was then presented to the judge requesting "Jamie's testimony and statement at

the police station the night of the incident and, Officer O'Gorman's testimony."  (N.T. 7/27/2001

at 112).  The judge asked counsel to join him in chambers to discuss how to proceed; the jurors

returned to the jury room.  After some discussion in chambers as to the meaning of the note, the

judge stated to counsel that he was unsure as to what specifically the jury wanted.  (N.T.

7/27/2001 at 112-113).  The judge then asked counsel "[d]o you have any objection if I question

them out of your presence - as to what the issues are."  (N.T. 7/27/2001 at 113).  The prosecutor

and defense counsel both indicated that they did not have an objection to the trial court judge

speaking to the jury outside their presence.  (N.T. 7/27/2001 at 113-114).  The judge then stated

"I wont discuss or give them any points.  I just want to clarify what it is that they are seeking."

(N.T. 7/27/2001 at 114).

　　　The judge then entered the jury room with the court crier and a stenographer, and

questioned the jury about the specifics of what they were requesting.  (N.T. 7/27/2001 at 114-

117).  While in the jury room, the trial court judge sought clarification of the jury's request.

When he was satisfied that he understood what the jury wanted, he explained general principles of Pennsylvania law regarding the materials that jurors are permitted to take back to the jury room.  (N.T. 7/27/2007 at 118-120).  Specifically, the trial court judge stated that under Pennsylvania law, jurors are not permitted to ask questions during trial, not permitted to take notes, not permitted to have exhibits during deliberations, and not permitted to have printed copies of the law that they are to apply.  (N.T. 7/27//2007 at 118-120).  Finally, the trial court judge ended his discussion by stating:

> . . . I think we can do this now.  I may be mistaken.  I know the
> statement is no difficulty because that is printed.  But again, even if
> counsel agreed for me to let you have the statement, I can't give
> you the statement to have back here because the Supreme Court of
> Pennsylvania won't let me do that, even with counsel's agreement,
> so I'll have to read it to you.  Okay?

(N.T. 7/27/2001 at 119-120).  The trial court judge then returned to the courtroom and explained to counsel that the jury was seeking Jamie Queenan's statement to the police and Officer O'Gorman's testimony regarding any statements that Petitioner had made.  (N.T. 7/27/2001 at 120-121).  Counsel and the trial court then discussed what portions of the record would be read back to the jury.  *Id.*  Notably, at this point, trial counsel voiced his concern that portions of Jamie Queenan's statement "might be hearsay" and therefore should not be read to the jury. (N.T. 7/27/2001 at 120).  In response to trial counsel's concerns, the trial court agreed to go over the statement with counsel and redact the statement as necessary.  (N.T. 7/27/2001 at 120-121). The jury was then brought back in, and the agreed-upon testimony and portions of Queenan's statement were read to the jury in open court.

The next instance of *ex parte* communication occurred on Monday, July 30, 2001.  The

10

jury again presented the trial court judge with a note stating: "does the finding in one charge negate the opposite finding in all the other charges?" (N.T. 7/30/2001 at 11). Again, the trial court judge stated that he did not know what specifically the jury was asking him and again he suggested that he go back to the jury room without the presence of counsel "to ask them if they would explain what it is that they mean." (N.T. 7/30/2001 at 11). The following exchange then occurred:

| | |
|---|---|
| The Court: | I can speculate what they mean but I don't know what they mean. Now, we could either bring them out or I could go back again like I did last time and ask them if they would explain what it is they mean. |
| [Defense Counsel]: | I don't have a problem with you clarifying the question in the back. |
| The Court: | I'd like to because I can't answer it because I don't understand it. |
| [Defense Counsel] | If that's permissible, I don't have a problem with that, if it works out that way |
| [Commonwealth]: | I don't have a problem with that, I don't think. |
| [Defense Counsel]: | I just don't know. I guess it's permissible. If we agree. |
| The Court: | Well, all right. I will go back and see them. |
| [Commonwealth]: | Or - yeah. |
| The Court: | I can bring them out and you can hear what they want to know. I won't bring [Petitioner] out for that. |
| [Defense Counsel]: | No. I mean you've done it once before where you went back, read something. I don't think that would be inappropriate since they're only clarifying what they asked. |

(N.T. 7/30/2001 at 11-12). The trial court judge then instructed defense counsel to tell Petitioner

that he was going to go back to the jury room to meet with the jurors.  (N.T. 7/30/2001 at 12).

After a discussion off the record, defense counsel stated that Petitioner agreed to allow the trial

court judge to speak to the jury without the presence of counsel.  (N.T. 7/30/2001 at 12).

The trial court judge then entered the jury room wherein the following exchange occurred:

> The Court:        I have your note and I have to say I'm somewhat mystified.
>                   I don't know what it means.  So that's why I'm back here.
>                   Perhaps you can explain it to me.  Do you want to explain it
>                   to me Sir?
>
> Juror No. 7:      I'll try to explain it to you.  The question is we're kind of
>                   stuck on one of the charges.  So the question there is if we
>                   find one way in that particular charge, would that negate the
>                   charges that we've ruled?
>
> The Court:        I think I understand.  It's not - they're not a package.  You
>                   can find guilty on certain charges and not guilty on other
>                   charges, if that's what you find the evidence shows or
>                   believe.  It doesn't have to be either guilty of everything or
>                   not guilty of everything.  If you find that the evidence
>                   supports certain of the charges and have been proven
>                   beyond a reasonable doubt, you can find Mr. Smith guilty.
>
>                   If you find on the other hand that on certain of the charges
>                   you don't feel that the evidence has, the Commonwealth's
>                   met its burden on the evidence, you can find not guilty on
>                   those charges.  So there's no inconsistency.
>                   In other words, if, for example - this is only for example - if
>                   you find not guilty of burglary, it doesn't mean that you
>                   couldn't find on attempted murder or vice verse so the
>                   answer to your question is no.
>
>                   If you find one way on one charge it doesn't negate or
>                   prevent you from finding differently on another charge.
>                   Each charge is considered a separate charge.  It's not a
>                   package deal.
>
>                   Now, so if one falls the others can stand, or if five fall, and
>                   one can stand.  It's whatever you feel the evidence shows.

<table>
<tr><td></td><td>Does that answer your question?</td></tr>
</table>

| | |
|---|---|
| Jurors: | Yes. |

(N.T. 7/30/2001 at 13-15).  Thereafter, the trial court judge returned to the courtroom and reported to counsel:

| | |
|---|---|
| The Court: | From what I could glean, they thought the charges were like a package deal.  It was either all or nothing.  They thought perhaps they had to find either guilty of all of the charges as opposed to guilty or not guilty, depending on the evidence on each individual charge, so I explained to them that they had to consider each charge separately and distinctly and determine whether or not the Commonwealth has met its burden on each charge separate and apart from the others. |

(N.T. 7/30/2001 at 15-16).  In response to the trial court's explanation of what had occurred in the jury room, the prosecutor stated "Okay" while defense counsel made no response.  *Id.*

The notes of testimony reflect that the trial court judge exited the jury room at 3:03 pm. At 3:15 pm, the jury returned a verdict of guilty on five of the eight charges.  *Id.*

In dismissing this claim on collateral appeal, the Superior Court found no merit in Petitioner's claim that trial counsel was ineffective for failing to object to the trial court's *ex parte* communication with the jury.  The court reasoned simply that counsel was not ineffective because "it is axiomatic that counsel will not be considered ineffective for failing to pursue meritless claims."  *Commonwealth v. Smith*, No. 2394 EDA 2005, at 8.  In reaching this conclusion, the Superior Court stated that it was in agreement with the PCRA court's finding that:

> A review of the entire record, and not simply those portions of it [Petitioner] cites to, indicates that [the trial] court did not have *ex parte* communications with the jury.  Rather [the trial] court, on the record and with the approval of both counsel, engaged the jury in a

13

> dialogue in an effort to make more clear inquiries the jury had
> posed to it so that [the trial] court could respond in a manner that
> addressed the jury's questions.

*Commonwealth v. Smith*, No. 2394 EDA 2005 (Pa. Super. Dec 12, 2006) (quoting PCRA Court

Opinion, *Commonwealth v. Smith*, CP 0011-1052 (Phila. C.C.P. January 20, 2006), attached as

Resp't Ex."C."

     In reviewing this claim, the state court applied *Commonwealth v Pierce*, 515 PA 153

(1987), the Pennsylvania state equivalent of *Strickland* [4] in finding that counsel was not

ineffective.  However, in his brief to the Superior Court, Petitioner asserted that his claim for

ineffective assistance of counsel should not be reviewed under *Strickland*.  Petitioner argued

instead that his claim for ineffective assistance of counsel should be reviewed under the United

States Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648 (1984).  Petitioner

contends that in *Cronic,* the Supreme Court held that in a case "where counsel [is] totally

excluded by the trial court from the process" prejudice need not be established but must be

presumed.  See *Pet'r Pet. for Allow. of Appeal* at 6-7, attached as Resp't Ex. "B."  Therefore,

Petitioner argues that as trial counsel was not present when the trial court judge spoke with the

jury, *Strickland* and its requirement to show prejudice is inapplicable to his claim of ineffective

assistance of counsel.

     Ordinarily, *Strickland* applies to claims of ineffective assistance of counsel.  However, in

*Cronic,* decided the same day as *Strickland*, the Supreme Court "recognized a narrow exception

---

[4]  The Pennsylvania Supreme Court has held that the Pennsylvania standard for reviewing
ineffective assistance of counsel claims is identical to the standard enunciated by the United
States Supreme Court in *Strickland*.  *Werts*, 228 F.3d at 203 (citing *Commonwealth v. Pierce*,
527 A.2d 973, 976-77 (Pa. 1987))

to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Florida v. Nixon*, 543 U. S. 175, 190 (2004) (discussing *Cronic*); *Bell v. Cone*, 535 U.S. 685 (2002).  *Cronic* held that a Sixth Amendment violation may be found "without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial," when "circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  *Bell v. Cone*, 535 U. S. 685, 695 (2002);  *Cronic*, 466 U.S. at 658.  The Supreme Court has identified three situations in which a reviewing court should apply *Cronic's* presumption that a Petitioner has been prejudiced.  *Bell*, 535 U.S. at 695.  The first situation is the "complete denial of counsel . . . where the accused is denied the presence of counsel at a 'critical stage.'" *Id.* at 695 (quoting *Cronic*, 466 U.S. at 659).  Second, when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.*  Third, where "counsel is called upon to render assistance under circumstances where competent counsel very likely could not."  *Id.*

Petitioner's seeks to qualify under the first exception identified in *Cronic* because he argues that trial counsel's failure to object to the trial court's *ex parte* communication with the jury deprived him of "the opportunity to have counsel present at a critical stage of the proceedings."  See *Pet'r Pet. for Allow. of Appeal* at 7, attached as Resp't Ex. "B."  As an initial matter, I note that the exception to *Strickland* carved out in *Cronic* which Petitioner invokes is not the deprivation of "the opportunity to have counsel present at a critical stage of the proceedings" but rather "the complete denial of counsel" at a critical stage of the proceedings. *Cronic,* 466 U.S. at 659.  In discussing this "complete denial" of counsel, the Court stated that

15

"the presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *Id.*  The Court then cited to a number of cases in which it had determined that a criminal defendant had experienced a complete denial of counsel.  See *United States v. Cronic*, 466 U.S. at 659, n. 25, (citing *Geders v. United States*, 425 U.S. 80, (1976) (order preventing defendant from consulting his counsel "about anything" during a 17-hour overnight recess impinged upon his Sixth Amendment right to the assistance of counsel); *Herring v. New York*, 422 U.S. 853 (1975) (trial judge's order denying counsel the opportunity to make a summation at close of bench trial denied defendant assistance of counsel); *Brooks v. Tennessee*, 406 U.S. 605 (1972) (law requiring defendant to testify first at trial or not at all deprived accused of "the 'guiding hand of counsel' in the timing of this critical element of his defense," i.e., when and whether to take the stand); *Ferguson v. Georgia*, 365 U.S. 570 (1961) (statute retaining common-law incompetency rule for criminal defendants, which denied the accused the right to have his counsel question him to elicit his statements before the jury, was inconsistent with Fourteenth Amendment); *Williams v. Kaiser*, 323 U.S. 471 (1945) (allegation that petitioner requested counsel but did not receive one at the time he was convicted and sentenced stated case for denial of due process)).  Consequently, a review of the above cases cited by the *Cronic* Court indicates that a defendant may invoke this exception "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659,  n. 25.

In the instant matter, trial counsel was neither totally absent nor prevented in some way from assisting Petitioner.  *Id.*  In both instances of *ex parte* communication, trial counsel was present and a full participant in the discussions leading up to the decision of the trial court to

enter the jury room without the presence of counsel.  As discussed above, in the first instance of *ex parte* communication, the trial court judge fully discussed the possibility of entering the jury room with trial counsel.  Moreover, the trial court specifically asked counsel if he had any objection to him questioning the jury outside the presence of counsel. ( N.T. 7/27/2001 at 113-114).  Counsel did not object to the trial court entering the jury room, and in fact indicated that he thought it was a good idea.  ( N.T. 7/27/2001 at 114).  Consequently, it cannot be said that defense counsel was absent from a critical stage of proceedings, nor can it be said that counsel was prevented in some way from assisting Petitioner.

In the second instance of *ex parte* communication, the trial court again specifically asked defense counsel his opinion on whether or not it would be permissible for the trial court to "go back [to the jury room] again like I did the last time and ask them if they would explain what it is they [want]. (N.T. 7/30/2001 at 11).  Defense counsel did not object to the judge again speaking to the jury outside of his presence.  In fact, counsel specifically stated "I don't have a problem with you clarifying the question in the back." *Id.*  The trial court then sought further clarification by stating "I can bring [the jury] out and you can hear what they want to know." *Id.*  Defense counsel responded  "No. I mean you've done it once before where you went back, read something.  I don't think that would be inappropriate since they're only clarifying what they asked." *Id.*

The record reflects that trial counsel then informed Petitioner that the trial court was going to speak with the jury outside the presence of counsel and that Petitioner was "also in agreement with that procedure." *Id.*  Consequently, because trial counsel was again fully engaged in discussions with the trial court, and was fully engaged in discussions with Petitioner

17

as to how to resolve the issue of questions from the jury, counsel was not totally absent.

Further, counsel was in no way prevented from assisting Petitioner.  In both instances of *ex parte* communication, trial counsel was specifically asked if he had any objection to the trial court speaking to the jury, and in both instances trial counsel was free to lodge an objection. Consequently, I conclude that trial counsel was neither totally absent nor prevented from assisting Petitioner at a critical stage of the proceeding.  *Cronic*, 466 U.S. at 659. I thus conclude that Petitioner has not established that this claim should be reviewed under the exception to *Strickland* carved out by *Cronic,* and the *Cronic* presumption of prejudice does not apply.

Having concluded that this claim is properly reviewed under *Strickland,* I turn next to the question of whether the Superior Court's analysis under *Strickland* resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  As noted above, in reviewing this claim on collateral appeal, the Superior Court determined that trial counsel was not ineffective for failing to object to the trial court's *ex parte* communication with the jury because the trial court had not, in fact, engaged in *ex parte* communication with the jury.  The Superior Court accordingly concluded that trial counsel could not be deemed ineffective for failing to pursue a meritless objection.

As an initial matter, the state court's determination of this issue rests upon the factual finding that the trial court did not engage in *ex parte* communication with the jury.  A review of the record in this matter contradicts that view.  It is clear that the trial court did, in fact, engage in *ex parte* communication with the jury on two separate occasions.  Moreover, I disagree with the Superior Court's conclusion that trial counsel was not ineffective because an objection to the trial court's actions would have been meritless.  Based upon the fact that the trial court did indeed

engage in *ex parte* communication with the jury, I conclude that trial counsel would have had a

meritorious basis for objecting to the trial court's actions.  See *United States v. Toliver*, 330 F.3d

607 (3d Cir. 2003) (finding that trial court's *ex parte* communication with jury was error but

finding no prejudice);  *Skill v. Martinez*, 677 F.2d 368 (3d Cir. 1982) (finding it was error for the

court to respond to jury inquiry during deliberations in absence of defense counsel); *United*

*States v. Green*, 544 F.2d 138 (3d Cir. 1976) (stating the court should avoid *ex parte*

communication with anyone associated with the trial); *Mashore v. Beard*, 2004 WL 350732

(E.D.Pa. February 24, 2004, McLaughlin, J.) (finding the trial court erred by engaging in *ex parte*

communication with the jury).

     Although I conclude that trial counsel would have had a meritorious basis for objecting to

the trial court's actions, *Strickland* requires a reviewing court to apply a strong presumption that

counsel's performance fell within the broad range of responsible professional representation and

that the challenged action might be considered sound trial strategy.  *Strickland*, 466 U.S. at 690.

A petitioner may overcome the presumption that a challenged action might be considered sound

trial strategy by showing either that the proffered strategy was not the motivating factor, or that

the complained of conduct could never be considered part of a sound strategy.  *Thomas v.*

*Varner*, 428 F. 3d 491, 499 (3d Cir. 2005).

     In the instant matter, I fail to see how trial counsel's failure to object to the trial court's *ex*

*parte* communication with the jury could be considered sound trial strategy.  There is no strategic

reason to explain trial counsel's failure to object to the trial court's *ex parte* communication with

the jury.  A review of the record reveals that trial counsel's failure to object stemmed from

confusion on the part of trial counsel as to whether it was permissible for the trial court to speak

19

with the jury *ex parte,* rather than a strategic decision. (N.T. 7/27/2001 at 113-114; N.T. 7/30/2001 at 11-12). Although judicial scrutiny of counsel's performance must be highly deferential, I cannot conclude that counsel rendered effective assistance when he acquiesced in the trial court's *ex parte* communication with the jury. As a result, I do not believe that the state court reasonably applied the *Strickland* standard when it concluded that counsel was not deficient for failing to raise a meritless objection.

Having concluded that counsel was ineffective for failing to object to the trial court's *ex parte* communication with the jury, I turn to the issue of whether trial counsel's ineffectiveness was prejudicial. To establish prejudice, Petitioner is required to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under the circumstances of this case, I conclude that it is not reasonably probable that the result of the proceedings would have been different if trial counsel had objected to the trial court judge entering the jury room without the presence of counsel.

As discussed above, the first time that the judge entered the jury room, he merely sought to clarify the exact extent of the testimony that the jury requested to have read back to them. Once the parameters of the jury's request were sufficiently defined, the judge returned to the courtroom and accurately relayed the information to counsel. Thereafter, the judge, the prosecutor, and trial counsel engaged in a discussion as to what portions of the requested testimony would be read back to the jury and what portions of the testimony would be redacted. When an agreement was reached, the jury was brought back into the courtroom, and the agreed-upon portions of testimony were then read back. Consequently, the ultimate result of this process

20

was that Petitioner's interests were fully represented and fully protected.  The fact that trial

counsel was informed of the jury's requests and was fully engaged in determining the proper

response to those requests leads me to conclude that even if trial counsel had objected and this

entire process had played out in open court, in the presence of counsel, the result would have

been the same.  Petitioner cannot establish that there is a reasonable probability that but for

counsel's actions, the result of the proceeding would have been different.  *Id.*

    The second time that the trial court judge entered the jury room presents a more difficult

question.  In this instance, the trial court judge again sought clarification of a note presented by

the jury but, unlike the first instance, the trial court judge did not return to the courtroom to

inform counsel what the jury wanted and to discuss how to proceed.  Instead, the trial court judge

immediately responded to the jury's question regarding whether a "finding in one charge

negate[s] the opposite finding in all the other charges" without first consulting counsel.  (N.T.

7/30/2001 at 11).  The trial court instructed the jury that each charge was to be considered a

separate charge, and that it was possible to find Petitioner guilty on some charges and not guilty

on other charges.  (N.T. 7/30/2001 at 13-15).  The jury was satisfied with this explanation.  The

trial court judge returned to the courtroom and explained to counsel what had occurred in the jury

room.  (N.T. 7/30/2001 at 15-16).  As previously noted, trial counsel did not object prior to the

trial court judge entering the jury room, nor did trial counsel object upon hearing that the trial

court judge had responded to the jury's question without first consulting counsel, nor did trial

counsel object to the substance of the trial court judge's instruction to the jury.

    A review of the jury's note suggests that the jury had reached a verdict on at least some of

the charges, but there was some confusion as to the effect that each individual verdict would have

21

on the charges as a whole.  Specifically, the jury appeared to be concerned that a finding of guilty

or not guilty on one (or more) charge may have the effect of invalidating a finding of guilty or not

guilty on one (or more) of the other charges.   This confusion as to the legal significance of a

finding of guilty or not guilty on one charge as related to the charges as a whole clearly presents a

situation requiring instruction by the trial court for which counsel should be present.

Notwithstanding this fact, I conclude that Petitioner cannot establish that had trial counsel

objected, there is a reasonable probability that the result of the proceedings would have been

different. *Strickland*, 466 U.S. at 694.  The jury's note indicates that they had reached at least a

partial verdict, and their only question was whether their mixed verdict was legally permissible.

The trial court correctly instructed the jury that "each charge is a separate charge" and that it is

possible to find Petitioner "guilty on certain charges and not guilty on other charges" according

to the evidence.  The jury immediately thereafter returned a verdict, finding Petitioner guilty on

five charges and not guilty on three charges.[5]

Therefore, given the reasonable conclusion that the jury was merely seeking to clarify

whether its determination was permissible under the law, I find that it is not reasonably probable

that the result of the proceedings would have been different had trial counsel lodged an objection.

*Id*.  Moreover, the trial judge's instruction to the jury clearly was a correct statement of the law.

Again, even if counsel had been consulted, the instruction to the jury would have been the same.

Petitioner cannot show that he was prejudiced by trial counsel's failure to object to the

trial court's *ex parte* communications with the jury.  Therefore, this claim will be denied.

---

[5]  Petitioner was found not guilty of possession of instruments of crime, aggravated
assault of Sharif Shabazz, and attempted murder of Sharif Shabazz.

3.      **Trial Court Error for Applying a Deadly Weapon Enhancement at Sentencing**.

Petitioner next alleges that his sentence was impermissibly "increased on the basis of facts found by the Judge rather than the jury" in violation of the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 524 U.S. 293 (2004).  *See* Pet. at 9.  Specifically, Petitioner argues that the trial court judge improperly applied Pennsylvania's deadly weapons enhancement and thereby impermissibly increased his sentence, even though the jury had acquitted him of the charge of possession of an instrument of crime.

In *Apprendi*, the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.  Thereafter, in *Blakely*, the Supreme Court held that the "statutory maximum for *Apprendi* purposes is the maximum sentence that a Judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 524 U.S. at 303.  In analyzing a claim under *Apprendi*, a reviewing court must first determine the prescribed statutory maximum sentence for the crime of which a petitioner was convicted, and determine whether the sentence exceeded the statutory maximum.  *Id.*  If the prescribed statutory maximum was exceeded, a reviewing court must then determine if the enhanced sentence was based upon the fact of a prior conviction.  *Apprendi*, 530 U.S. at 490.  "If it was, then the sentence is constitutional.  If it was not, then the sentence is unconstitutional." *United States v. Williams*, 235 F.3d 858, 863  n. 4 (3d Cir. 2000) (quoting *United States v. Mack*, 229 F.3d 226, 237 (3d Cir. 2000)). Therefore, *Apprendi* only applies when

a court imposes a sentence in excess of the statutory maximum on the basis of a fact not found by the jury beyond a reasonable doubt. *United States v. Zimmerman*, 80 Fed. Appx. 160, 164 (3d Cir. 2003) (not precedential). An *Apprendi* violation does not occur where the sentence imposed does not exceed the statutory maximum. *Id.*

In reviewing this claim on collateral appeal, the Pennsylvania Superior Court declined to address Petitioner's claim under *Apprendi* and *Blakely*, stating in a footnote that "[w]e also reject [Petitioner's] suggestion that his Sixth Amendment rights were violated by the imposition of an illegal sentence outside of the aggravated range. The sentence imposed by the trial court did not exceed the statutory maximum. Therefore, neither *Blakely* (citations omitted) nor *Apprendi* (citations omitted) is implicated." *Commonwealth v. Smith*, No. 2394 EDA 2005, at 12, n. 5 (Pa. Super. Dec. 12, 2006).

I agree with the state court's finding that the sentence imposed by the trial court does not exceed the statutory maximum and thus does not implicate *Apprendi*. Petitioner was convicted of attempted murder, aggravated assault, simple assault, burglary, and conspiracy. Section 1102 of the Pennsylvania Crimes Code sets forth the statutory maximum for a conviction of attempted murder and conspiracy to commit murder as follows:

> [A] person who has been convicted of attempt, solicitation or conspiracy to commit murder, murder of an unborn child or murder of a law enforcement officer where serious bodily injury results may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 40 years. Where serious bodily injury does not result, the person may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 20 years.

18 PA. CONS. STAT. ANN. § 1102(c). Therefore, the maximum sentence Petitioner could have

received under the statute was 20 years of imprisonment for the attempted murder conviction and

an additional 20 years of imprisonment for his conviction for conspiracy to commit murder.

Petitioner was sentenced to 10 to 20 years of imprisonment for the attempted murder conviction

and no additional sentence was imposed for the conviction for conspiracy.  (N.T. 10/26/2001 at

18-19).  Consequently, this sentence fails to exceed the statutory maximum provided for under

Pennsylvania law.

Petitioner was also convicted on the charge of burglary.  The statutory maximum for a

conviction for burglary graded as a felony of the first degree is a term of imprisonment "of not

more than 20 years." *See* 18 PA. CONS. STAT. ANN. § 1103(1); *see also* 18 PA. CONS. STAT. ANN.

§ 3502.  Petitioner was sentenced to a term of 3 to 6 years of imprisonment for this conviction.

(N.T. 10/26/2001 at 19).  Again, this sentence fails to exceed the statutory maximum allowable

under Pennsylvania law.

Lastly, Petitioner was convicted of the charge of simple assault.  The statutory maximum

for a conviction for simple assault graded as a misdemeanor of the second degree is a term of 2

years of imprisonment.  *See* 18 PA. CONS. STAT. ANN. § 1104(2); *see also* 18 PA. CONS. STAT.

ANN. § 2701.  Petitioner was sentenced to a term of 6 to 12 months for this conviction, which

also does not exceed the statutory maximum.  (N.T. 10/26/2001 at 19).

Thus, because the trial court did not impose a sentence in excess of the statutory

maximum provided for under Pennsylvania law, this matter is not governed by *Apprendi*.

I also agree with the states court's conclusion that *Blakely* is inapplicable in the instant

matter.  The Supreme Court's decision in *Blakely* was announced on June 24, 2004.  Petitioner's

conviction became final over one year before the Court's decision in *Blakely* on January 17,

2003,[6]  As the state court correctly noted, *Blakely* does not apply retroactively to cases on collateral appeal.

Generally, a federal habeas petitioner may not rely on a new rule of criminal procedure decided after his conviction has become final on direct appeal.  *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004);  *Teague v. Lane*, 489 U.S. 288, 310 (1989) (stating that  "new constitutional rules of criminal procedure will not be applicable to those cases which become final before the new rules are announced").   Under the Supreme Court's retroactivity analysis as set forth in *Teague,* a federal habeas petitioner may not avail themselves of a new rule of criminal procedure unless that rule meets one of two narrow exceptions:  "it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," or it announces a "watershed rule of criminal procedure."  *Id.* at 311.  Neither the Supreme Court nor the Third Circuit has held that the rule announced in *Blakely* meets this standard.  Moreover, the Third Circuit has consistently held that the rules announced in the *Apprendi* line of cases (*Apprendi, Blakely, United States v. Booker*, 543 U.S. 220 (2005)) are not applicable retroactively to cases on collateral review.  *See United States v. Swinton*, 333 F.3d 481, 489 (3d Cir. 2003);  *Lloyd v. United States*, 407 F.3d 608, 613 (3d Cir. 2005);  *In re Olopade*, 403 F.3d 159 (3d Cir.2005) (discussing non-retroactive application of *Apprendi, Blakely*, and *Booker*).  Consequently, because *Blakely* is not applicable to Petitioner's claim and because the state

---

[6]  Petitioner's judgment of sentence was affirmed by the Pennsylvania Superior Court on December 18, 2002.  *Commonwealth v. Smith*, 817 A.2d 1185 (Pa. Super. 2002) (table). Petitioner did not file a petition for allowance of appeal in the Pennsylvania Supreme Court therefore his conviction became final 30 days later at the expiration of time for seeking such review.  *Morris v. Horn*, 187 F.3d 333, 337 n. 1 (3d Cir. 1999); see Pa.R.A.P. 1113 ("Time for Petitioning for Allowance of Appeal").

court's finding on this issue is neither contrary to nor unreasonable application of United States Supreme Court precedent, this claim will be denied.  28 U.S.C. § 2254(d).

Moreover, in addition to finding that *Apprendi* and *Blakely* do not apply to the instant claim, the state court also found that Petitioner's claim lacked merit.  I agree.  In reviewing Petitioner's claim that the trial court improperly applied the deadly weapons enhancement, the Superior Court found that under Pennsylvania law the application of the deadly weapons enhancement "was not only appropriate but also required." *Commonwealth v. Smith*, No. 2394 EDA 2005 at 12, (Pa. Super. Dec. 12, 2006), attached as Resp't Ex. "C.  The Superior Court cited to its ruling in *Commonwealth v. Johnakin*, 502 A.2d 620 (Pa. Super. 1985), in which the defendant was found guilty of robbery and aggravated assault, but acquitted of the charge of possessing an instrument of crime.  The trial court declined to apply the deadly weapons enhancement.  The Commonwealth appealed the judgment of sentence, arguing that the deadly weapons enhancement should have been applied to defendant's sentence because the trial court had found that the defendant had used a weapon to stab the victim. *Id.* at 436-437.  The Superior Court agreed, stating that "the Commonwealth is [] correct that the trial court was required to apply the deadly weapon enhancement provision of the guidelines." *Id.* at 436.  The court reasoned that the deadly weapons enhancement "applies whenever the court determines that the defendant possessed a deadly weapon" and that "[t]he fact that [defendant] was acquitted on the charge of possession of an instrument of crime does not alter this determination." *Id.*  The Superior Court also cited *Commonwealth v. Reading*, 603 A.2d 197 (Pa. Super. 1992), in which the defendant was charged with murder, voluntary manslaughter, involuntary manslaughter and possession of an instrument of crime.  The defendant was found guilty of involuntary

27

manslaughter for the shooting of her house-mate, but acquitted of possessing an instrument of a crime. The trial court did not apply the deadly weapons enhancement. The Commonwealth appealed the judgment of sentence on the grounds that the trial court was required to apply the deadly weapons enhancement. The Superior Court agreed, vacated the judgment of sentence and remanded for re-sentencing. Again, the Superior Court found that "the court was required to apply the deadly weapon enhancement." *Id.* at 200.

In the instant matter, the trial court determined that "the evidence showed that [Petitioner] forced himself into the Lloyd house and he or his accomplice fired a gunshot." *Commonwealth v. Smith*, No. 2394 EDA 2005 at 10, (Pa. Super. Dec. 12, 2006) (citing *Commonwealth v. Smith*, CP# 0011-1052 at 3-4, (Phila. Ct. of Comm. Pleas Oct. 28, 2002), attached as Resp't Ex. "C." Mr. Lloyd ran upstairs with [Petitioner] following close behind. *Id.* As Mr. Lloyd struggled with [Petitioner] trying to disarm him [Petitioner] fired another gunshot." *Id.* Thus, the Superior Court noted that the trial court judge "clearly determined that [Petitioner] used a gun in the course of the commission of that crime," *Id.*, and that the "application of the [deadly weapons] enhancement was not only appropriate but also required." *Id.* at 12.

I find the state court determination reasonable. Pennsylvania's deadly weapon enhancement in effect[7] at the time of Petitioner's sentencing  provides that:

> (a) When the court determines that the defendant possessed a deadly weapon, as
> defined in 18 Pa. C.S.A. §2301 (relating to definitions), during the commission of

---

[7] The deadly weapon enhancement at issue in the instant matter became effective June 13, 1997, and was in effect until amended on February 9, 2005, with an effective date of June 3, 2005. The current version of Pennsylvania's deadly weapon enhancement contains separate provisions for when the court determines that an offender "possessed a deadly weapon" or "used a deadly weapon," but it maintains the language stating that the determination is made by the court. *See* 204 Pa. Code § 303.10 (a)(1-2).

the current conviction offense; at least 12 months and up to 24 months
confinement shall be added to the guideline sentence range which would
otherwise have been applicable.

204 Pa. Code §303.4(a). In the instant matter, the court reasonably determined that Petitioner

possessed a deadly weapon during the commission of the crimes for which he was found guilty.

Substantial evidence was presented at trial on this point. Jaime Queenan testified that Petitioner

and an accomplice forced their way into the Lloyd house at gunpoint and proceeded to shoot at

Joseph Lloyd, a resident of the house, as he attempted to flee up the stairs. (N.T. 7/24/2001 at

78-80). Lloyd testified that he attempted to prevent Petitioner and his accomplice from entering

his home when he was confronted with a gun. (N.T. 7/25/2001 at 12). Lloyd further testified

that Petitioner and his accomplice fired at him after forcing their way through the door, and

continued to shoot at him as they chased him up the stairs. (N.T. 7/25/2001 at 15-18). Lloyd

testified that after he made it up the stairs he began to struggle with Petitioner in an attempt to

take the gun away from him. *Id.* Lloyd further testified that as he struggled with Petitioner for

possession of the gun, it discharged, firing a shot into the floor. *Id.* Diane Holliday, Lloyd's

mother, testified that upon hearing loud noises in her living room, she ran down the stairs from

her bedroom and noticed two individuals fighting. (N.T. 7/25/2001 at 72). Holliday further

testified that as she was standing on the stairs she saw a flash and heard a gunshot ring out. *Id.*

Sharif Shabazz, Holliday's husband, testified that when he entered the living where Lloyd and

Petitioner were fighting over a gun, he attempted to get between them and in the process found

that his hand was on the gun. (N.T. 7/25/2001 at 115). Shabazz testified that he was able to take

the gun away from Petitioner, at which point Petitioner fled. *Id.*

Consequently, based upon the substantial evidence presented at trial, and the facts and

circumstances as testified to by the witnesses above, I conclude that the trial court reasonably determined that Petitioner was in possession of a deadly weapon and appropriately applied the deadly weapon enhancement to Petitioner's sentence.

Finally, to the extent that Petitioner argues generally that his sentence is excessive, the Third Circuit has held that absent a Constitutional violation, a federal court has no power to review a sentence in a habeas corpus proceeding unless it exceeds the statutory limits. *Hoagland v. Neubert*, 1988 WL 81771, at *2 (D.N.J. Aug. 1, 1988) (citing *Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40 (3d Cir. 1984)); *see also U.S. ex rel. Jackson v. Myers*, 374 F.2d 707, 711 n. 11 (3d Cir. 1967) (the severity of a defendant's sentence alone does not constitute grounds for federal habeas relief); *Knight v. Beyer*, 1989 WL 68618, at *6 (E.D. Pa. June 22, 1989) ("[a]bsent some constitutional violation, it is clear that, particularly in the area of state sentencing guidelines, federal courts cannot review a state's alleged failure to adhere to its own sentencing procedure").  Thus, a state court's sentencing decision and claims arising out of that decision are generally not constitutionally cognizable.  *See, e.g., Twyman v. Carr*, 1997 WL 309456 at *3 (D.Del. Apr. 7, 1997).  Consequently, this claim will be denied.


## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, I am required to make a determination as to whether a COA should issue.  "A [COA] should issue 'only if the applicant has made a substantial showing of the denial of a constitutional right.'" *United States v. Drake*, 38 Fed.Appx. 698 (3d Cir. 2002) (quoting 28 U.S.C. § 2253(c)(2)); *see Miller-EL v.*

*Cockrell*, 537 U.S. 322, 337 (2003);  *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  "Under the

controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether (or

for that matter, agree that) the petition should have been resolved in a different manner or that the

issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El,* 537

U.S. at 336.  (quoting *Slack, supra*, 529 U.S. at 484).   "The petitioner must demonstrate that

reasonable jurists would find the district court's assessment of the constitutional claims debatable

or wrong." *Slack*, 529 U.S. at 484; *see Miller-EL*, 537 U.S at 337; *Drake*, 38 Fed.Appx at 698.

      In the instant case, the question of whether Petitioner has met this standard is a close one

as it relates to his second claim, ineffective assistance of counsel for failing to object to the trial

court's *ex parte* communications with the jury.  I acknowledge that reasonable jurists may find

debatable my analysis of Petitioner's claim under *Cronic*.  *See Easley v. Vaughn*, 1998 WL

196401, at *2 (E.D. Pa. April 22, 1998) (certifying issue for appeal "because it is possible that

other reasonable jurists could debate over whether the issue deserves further proceedings").

Consequently, this issue will be certified for appeal.  *See Slack*, 529 U.S. at 484;  *Drake*, 2002

WL 1020972, at *1.

31